| | |
|---|---|
| IN RE STUART SCOTT SNYDER, and DOREEN ANNE SNYDER, Debtors. | |
| STUART SCOTT SNYDER, and DOREEN ANNE SNYDER, Defendants-Appellants, v. JOSEPH J. MURPHY, and NANCY A. MURPHY, Plaintiffs-Appellees. | No. 3:17-cv-00840 (SRU) |

### RULING AND ORDER

Stuart Scott Snyder and Doreen Anne Snyder appeal from an order of the United States Bankruptcy Court for the District of Connecticut (Manning, C.J.) (the "Bankruptcy Court") deeming nondischargeable a judgment rendered against the Snyders in favor of Joseph Murphy and Nancy Murphy by the United States District Court for the Eastern District of New York (the "District Court"). For the following reasons, I affirm the judgment of the Bankruptcy Court.

## I.     Standard of Review

The district courts have jurisdiction to hear appeals from "final judgments, orders and decrees" of the bankruptcy courts. 28 U.S.C. § 158(a). In the context of an adversary proceeding within a bankruptcy case, an award of summary judgment is a final appealable order because it "completely resolve[s] all of the issues pertaining to the discrete claim." *In re Miner*, 222 B.R. 199, 202 (2d Cir. BAP 1998); *see Hoffman v. Cheek*, 90 B.R. 21, 21 (D. Conn. 1988).

"Generally in bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law de novo." *In re Charter Commc'ns*, 691 F.3d 476, 482–83 (2d Cir. 2012). Because a motion for summary judgment does not permit the court to find any facts, however, *see Flaherty v. Lang*, 199 F.3d 607, 615 (2d Cir. 1999), "[a] grant of summary judgment is reviewed de novo by the appellate court." *Andrews v. McCarron (In re Vincent Andrews Mgmt. Corp.)*, 507 B.R. 78, 81 (D. Conn. 2014).

## II.    Background[1]

Plaintiffs Joseph Murphy and Nancy Murphy are a married couple who live in Suffolk County, New York. Bankr. Compl., App'x at 3; Bankr. Answer, App'x at 15. Joseph Murphy's sister, defendant Doreen Anne Snyder, is married to defendant Stuart Scott Snyder. The Snyders live in Greenwich, Connecticut. Bankr. Compl., App'x at 3; Bankr. Answer, App'x at 15. Prior to the events that are the subject of the District Court lawsuit, the parties "had a very close relationship . . . , celebrated holidays and vacationed together, and enjoyed a relationship of personal trust." Bankr. Answer, App'x at 15–16; *see* Bankr. Compl., App'x at 4 (same).

Scott Snyder has worked in the construction business for more than twenty years, owning several entities through which he builds and renovates luxury homes and commercial properties. Joseph Murphy is a retired New York City firefighter and police officer. In 2005, Joseph approached Stuart to discuss investment opportunities for real estate projects. Stuart "offered the Murphys an opportunity to participate as 'silent partners' by investing $100,000 in two luxury home projects in Haworth, New Jersey" (the "Haworth Project"). *Murphy v. Snyder*, 2014 U.S. Dist. LEXIS 134097, at *4 (E.D.N.Y. Aug. 15, 2014), *report and recommendation adopted*, 2014 U.S. Dist. LEXIS 133179 (E.D.N.Y. Sept. 22, 2014). In exchange for the $100,000, Stuart

---

[1] Unless otherwise indicated, the facts are taken from the ruling below.

"guarantee[d] the Murphys the return of their initial investment plus twenty percent in approximately one year." *Id.* The Murphys accepted the arrangement and entered into an oral agreement with the Snyders. On behalf of himself and his wife, on December 28, 2005, Joseph wire-transferred $100,000 to an attorney trust account in the name of "Defendants' then counsel, Steven Freesman."[2] *Murphy*, 2014 U.S. Dist. LEXIS 134097, at *41. One week later, the Murphys received the blueprints for the Haworth Project.

The Murphys and the Snyders subsequently entered into a second oral agreement to purchase a vacant lot located on Bible Street in Greenwich, Connecticut, for the purpose of constructing a custom-built luxury home for sale (the "Bible Street Project"). Unlike the Haworth Project, the Murphys were to be the Snyders' only partners on the Bible Street Project, and Joseph Murphy intended to actively participate in the construction and sale of the property. "Stuart again guaranteed the Murphys their initial investment plus a [twenty percent] return and possibly more." *Id.* at *5. On August 28, 2006, Joseph Murphy wire-transferred $275,000— which he and Nancy Murphy allegedly obtained by mortgaging their family home, *id.*—to a bank account in the name of one of the Snyders' companies.

The Haworth Project was finished by July 2009, when one of the houses was sold for $1.4 million. Bankr. Compl., App'x at 9; Bankr. Answer, App'x at 22. The other house appears to have eventually been sold in March 2012 for $1.3 million, *see* Deed, App'x at 281, after a period in which it was leased for $9,000 per month. Dist. Ct. Compl., App'x at 90; Appellants' Br., Doc. No. 16, at 15. With respect to the Bible Street Project, however, the Snyders never

---

[2] The Snyders claim that Freesman was not their attorney, but represented another investor, Michael Maisel. *See* Appellants' Br., Doc. No. 16, at 11. The District Court concluded otherwise, and because that determination was necessary to support the Court's holding that the Snyders breached the Haworth Project contract, it is entitled to preclusive effect as explained below.

purchased the property in Connecticut. Instead, they used the Murphys' $275,000 to build two other luxury homes in Demarest, New Jersey (the "Demarest Project").[3] Those houses were sold in 2010 for over $3 million each. Bankr. Compl., App'x at 9; Bankr. Answer, App'x at 22.

Despite at least portions of the Haworth and Demarest Projects turning a profit,[4] the Murphys never recovered their investments and never received the promised 20 percent returns. In addition, Scott Snyder spent at least $20,000 of the Murphys' investment on personal items. *See* Appellants' Br., Doc. No. 16, at 14. Records and checks obtained from the Snyders' bank indicate that there was less than $1,000 in the Snyders' account at the time the Murphys wired their $275,000 investment on August 28, 2006. Over the next two months, nearly all of the Murphys' money was depleted—even though the Snyders failed to purchase the Bible Street property—as the Snyders withdrew money to pay for an expensive meal in Washington, D.C., car repairs, yacht club dues, and the Snyders' daughter's college textbooks. *See* Bankr. Local Rule 56(a)2 Statement, App'x at 338–39. The Snyders also used the account to withdraw more than $10,000 in cash and pay off more than $50,000 of credit card debt. *Id.*

---

[3] The Snyders claim that the Murphys were told that the Bible Street Project would not proceed and consented to the use of the money for the Demarest Project. *See* Stuart Snyder Aff., App'x at 322. The Murphys allege that they were "constantly misled" by the Snyders and did not learn about the Demarest Project until "after years of story after story." *See* Bankr. Compl., App'x at 8. The District Court adopted the Murphys' account: in holding the Snyders liable for breach of contract, the Court concluded that the Snyders "breached th[e] agreement by failing to purchase the Bible Street property, and instead, used [the Murphys'] monies for other projects and purposes without notice to or authorization by [the Murphys]." *See Murphy v. Snyder*, 2014 U.S. Dist. LEXIS 134097, at *26 (E.D.N.Y. Aug. 15, 2014), *report and recommendation adopted*, 2014 U.S. Dist. LEXIS 133179 (E.D.N.Y. Sept. 22, 2014). That determination was necessary to support the District Court Judgment and is entitled to preclusive effect as explained below.

[4] The Snyders allege that one of the houses in the Haworth Project was sold at a loss. They admit, however, that the other sold for a $150,000 profit. *See* Appellants' Br., Doc. No. 16, at 15.

On April 6, 2010, the Murphys filed a seven-count complaint against the Snyders, their companies, and other defendants in the United States District Court for the Eastern District of New York, alleging (1) breach of contract; (2) conversion; (3) unjust enrichment; (4) fraudulent inducement; (5) money had and received; (6) breach of fiduciary duty; and (7) an accounting. *See Murphy*, 2014 U.S. Dist. LEXIS 134097, at *7. The Snyders answered the complaint on November 12, 2010. *Id.* at *8. A farcical four years of litigation ensued, in which the Snyders abruptly shuffled attorneys, neglected to respond to discovery, and failed to appear at hearings and conferences held by the District Court.

On September 15, 2011, as a sanction for the defendants' "obstreperous conduct regarding the discovery responses" and "blatant[] [disregard[] [of] prior Orders," the District Court struck the Snyders' answer and entered a default judgment against the Snyders and their companies. *Id.* at *10. While the court was calculating the Murphys' damages, the Snyders appeared through new counsel and moved to vacate the default judgment. On March 29, 2013, the District Court vacated the default judgment. Subsequently, the Snyders' attorneys—who had changed once again—moved to withdraw because they "had been unable to communicate with their clients and had accrued large sums of outstanding attorneys' fees." *Id.* at *15. The District Court granted the motion to withdraw, and the Snyders appeared pro se. The court warned the Snyders that their corporations could not proceed pro se, and that "failure to retain counsel for the corporate entities would very likely result in default judgments being entered against them." *Id.* Despite the warning, the Snyders never retained new counsel for their companies.

After they appeared pro se, the Snyders "provided no responses" to discovery, "failed or refused to appear at their scheduled depositions," and neglected to attend several hearings before the court. *Id.* at *17. The Murphys moved the District Court to strike the Snyders' answer as a

sanction and enter a default judgment against the Snyders and their companies. Concluding that the Snyders had "consistently disregarded their discovery obligations as well as multiple Orders of the Court," *id.* at *20, and had continued in their "recalcitrant conduct . . . despite numerous warnings and the issuance of multiple sanctions," *id.* at *22–*24, the District Court granted the Murphys' motion and struck the Snyders' answer.

The District Court proceeded to determine whether the Murphys' claims "set forth a valid cause of action," as required for entry of default judgment. *Id.* at *24. The Court concluded that the Murphys had "adequately pleaded a breach of contract claim." *Id.* at *26. The alleged facts plausibly indicated that the Murphys "entered into [two] oral investment agreement[s]" with the Snyders; that they transferred a total of $375,000 in fulfillment of the agreements; that the Snyders "breached the contract[s] by failing to return [the Murphys'] initial investment[s], in addition to the [twenty percent] return[s] on their investment[s]"; and that the Murphys suffered damages. *Id.* at *26–*27. The District Court also held that the Snyders separately breached the agreement concerning the Bible Street Project "by failing to purchase the Bible Street property, and instead, us[ing] [the Murphys'] monies for other projects and purposes without notice to or authorization by [the Murphys]." *Id.* at *27. Thus, the Court held that the Murphys had "successfully set out the elements of a claim for breach of contract." *Id.*

The District Court declined to enter default judgment on the Murphys' other claims, however. It concluded that the remaining claims were either "duplicative" of the breach of contract claim, *see id.* at *28–*29 (conversion); *id.* at *31–*32 (fraudulent inducement); *id.* at *35–*36 (breach of fiduciary duty), or else were precluded due to the existence of a valid contract. *Id.* at *30–*31 (unjust enrichment); *id.* at *36–*37 (money had and received); *id.* at *38–*39 (accounting). The Court also declined to impose punitive damages on the Snyders

because it had held that "default judgment [would] not be entered on the breach of fiduciary duty claim." *Id.* at *47. As a result, the District Court granted the Murphys' motion for default judgment on the breach of contract claim only, and awarded them $450,000 in compensatory damages, plus interest and costs. *Id.* at *51–*52. Judgment entered on September 23, 2014.

On April 23, 2015, the Snyders filed a petition for bankruptcy in the United States Bankruptcy Court for the District of Connecticut.[5] On July 27, 2015, the Murphys initiated an adversary proceeding by filing a three-count complaint seeking a declaration that the District Court judgment was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), & (a)(6). The Snyders filed an answer on December 11, 2015. On August 10, 2016, the Murphys filed a motion for summary judgment on all three counts, which the Snyders opposed on September 14, 2016. On May 5, 2017, the Bankruptcy Court issued an order granting the Murphys' motion with respect to Counts Two and Three of the Adversary Complaint (alleging nondischargeability under section 523(a)(4) and section 523(a)(6), respectively) and denying the motion with respect to Count One (alleging nondischargeability under section 523(a)(2)(A)).

The Snyders timely appealed on May 17, 2017. Doc. No. 1.

### III.    Discussion

A discharge under Chapter 7 of the Bankruptcy Code "discharges the debtor from all debts that arose before the date of the order for relief." 11 U.S.C. § 727(b). Such a discharge does not, however, discharge any debt incurred through (among other things):

> (4) . . . fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; [or]
>
>        . . .

[5] The Snyders' petition originally sought relief under Chapter 11, but was converted to a Chapter 7 proceeding on June 1, 2016.

(6) . . . willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

*Id.* at § 523(a). "A creditor seeking to establish nondischargeability under § 523(a) must do so by the preponderance of the evidence." *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006).

"Parties may invoke collateral estoppel to preclude relitigation of the elements necessary to meet a § 523(a) exception." *Id.* Here, the Bankruptcy Court applied collateral estoppel to the District Court Judgment and held that the Snyders' debt was nondischargeable because it had been incurred through "defalcation while acting in a fiduciary capacity," *In re Snyder*, 2017 WL 1839122 (D. Conn. May 5, 2017), at *10; "embezzlement," *id.* at *11; and/or "willful and malicious injury . . . to another." *Id.* at *12. The Snyders argue that the District Court Judgment did not render their debt nondischargeable because, among other things, the judgment "had no collateral estoppel effect as to Defendants' intent." Appellants' Br., Doc. No. 16, at 37.

First, I will consider whether the Bankruptcy Court's application of collateral estoppel was proper. If it was, then I will proceed to assess whether the District Court Judgment establishes as a matter of law the nondischargeability of the Snyders' debt.

A. Collateral estoppel

"[A] bankruptcy court [may] properly give collateral estoppel effect to those elements of the claim that are identical to the elements required for discharge and which were actually litigated and determined in the prior action." *Grogan v. Garner*, 498 U.S. 279, 285 (1991). Under federal law—which courts "apply to establish the preclusive effect of a prior federal judgment," *Ball*, 451 F.3d at 69—collateral estoppel applies only when:

(1) the identical issue was raised in a previous proceeding;

(2) the issue was actually litigated and decided in the previous proceeding;

(3) the party had a full and fair opportunity to litigate the issue; and

> (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Id.* The party seeking to apply collateral estoppel must establish the doctrine's elements by a preponderance of the evidence. *See Grogan*, 498 U.S. at 287.

As an initial matter, I note that the District Court Judgment was entered on default, not litigated on the merits. The Snyders assert, correctly, that "a default judgment will not normally support the application of collateral estoppel because 'in the case of a judgment entered by confession, consent, or default, none of the issues are actually litigated.'" Appellants' Br., Doc. No. 16, at 20 (quoting *In re Bush*, 62 F.3d 1319, 1323–24 (11th Cir. 1995)). Nevertheless, several circuit courts—and district courts within the Second Circuit—"recognize an *exception* to the 'actually litigated' requirement," which applies "when the party sought to be precluded actually participated in the prior litigation *and* had a full and fair opportunity to litigate, but the issue was resolved by default as a sanction on account of that party's obstructive behavior." *In re Corey*, 394 B.R. 519, 527–28 (10th Cir. BAP 2008), *aff'd*, 583 F.3d 1249 (10th Cir. 2009); *see In re Adler, Coleman Clearing Corp.*, 205 F. App'x 856, 857 n.1 (2d Cir. 2006) (summary order) (observing that "[s]everal other circuits have allowed a default judgment entered as a procedural sanction to be accorded preclusive effect in a subsequent action," but declining to decide whether to adopt that rule). Here, the District Court Judgment "was not an ordinary default judgment." *Corey*, 583 F.3d at 1253 (quoting *FDIC v. Daily (In re Daily)*, 47 F.3d 365, 368 (9th Cir. 1995)). The Snyders extensively participated in the District Court proceedings over the course of several years, and "the only reason that the first court did not have to assess the merits of the [case] . . . is that the losing part[ies'] misconduct forfeited [their] right to such an assessment." *See id.*; *cf. In re Bugnacki*, 439 B.R. 12, 25 (Bankr. D. Conn. 2010) (applying collateral estoppel to a default judgment when the defendant "significant[ly] participat[ed]" in the litigation, "engaged in

improper litigation tactics[,] and repeatedly failed to comply with various discovery requests," causing the default judgment to be entered as a sanction). Because the Snyders "had a 'full and fair opportunity' to defend against the lawsuit but chose not to do so," I conclude that the District Court Judgment falls within the exception to the "actually litigated" requirement. *See In re Delaney*, 504 B.R. 738, 752 (Bankr. D. Conn. 2014).

In the ruling below, the Bankruptcy Court held that collateral estoppel applied to the default judgment, and "g[ave] collateral estoppel effect" to "[t]he issues on which the District Court made specific findings." *Snyder*, 2017 WL 1839122, at *8. The Bankruptcy Court identified those issues as (i) "that both [the Snyders] are liable," *id.*; (ii) "that [the Snyders] breached their contract with [the Murphys]," *id.*; (iii) "that damages should be awarded to [the Murphys] in the amount of $450,000," *id.*; and (iv) "that [the Snyders] and [the Murphys] were fiduciaries under New York law." *Id.* I agree with the Bankruptcy Court that collateral estoppel applies with respect to the first three issues, which "w[ere] raised in [the] previous proceeding, . . . actually litigated and decided," subject to "a fully and fair opportunity to litigate," and "necessary to support a valid and final judgment on the merits."[6] *See Ball*, 451 F.3d at 69. Hence, the Snyders may not relitigate those issues in the bankruptcy proceedings.

Collateral estoppel does not apply, however, with respect to whether the Snyders were fiduciaries. Although the District Court indicated that "a fiduciary relationship existed between . . . Joseph Murphy and his . . . brother-in-law Stuart Snyder," it nonetheless denied the Murphys' motion to enter default judgment on their breach of fiduciary claim because that claim was "entirely derivative of the underlying breach of contract." *Murphy*, 2014 U.S. Dist. LEXIS

---

[6] As indicated in notes 2 and 3, *supra*, the District Court's findings that Freesman was the Snyders' attorney and that the Murphys did not consent to the use of their money for the Demarest Project are entitled to estoppel effect for the same reasons.

134097, at \*34–\*35.  Thus, the District Court's identification of a fiduciary relationship between the parties was "nonessential" and "ha[d] the characteristics of dicta." *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 32 (2d Cir. 2017) (quoting Restatement (Second) of Judgments § 27 cmt. h). Because the District Court Judgment was "not dependent on the determination" that the Snyders and the Murphys were in a fiduciary relationship, the Snyders "may relitigate th[at] issue in a subsequent action." *Id.* (citing Restatement (Second) of Judgments § 27 cmt. h).

B.  Section 523(a)(4)

"Section 523(a)(4) of the Federal Bankruptcy Code provides that an individual cannot obtain a bankruptcy discharge from a debt 'for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013) (quoting 11 U.S.C. § 523(a)(4)). That exception, "like most, must be narrowly construed." *In re Hyman*, 502 F.3d 61, 66 (2d Cir. 2007). The Murphys claim—and the Bankruptcy Court held—that the District Court Judgment is nondischargeable under section 523(a)(4) because the debt was incurred through (1) defalcation while acting in a fiduciary capacity and/or (2) embezzlement. I consider each exception in turn.

1.  *Defalcation*

To establish nondischargeability for defalcation, the creditor must show "(i) the existence of a fiduciary relationship between the debtor and the objecting creditor, and (ii) a defalcation committed by the debtor in the course of that relationship." *In re Nofer*, 514 B.R. 346, 353 (Bankr. E.D.N.Y. 2014). Because "[t]he question of whether a defalcation has occurred is reached only when the threshold determination that the debtor acted in a fiduciary capacity has been made," *In re Hayes*, 183 F.3d 162, 170 (2d Cir. 1999), I begin by addressing whether the Snyders and the Murphys were in a fiduciary relationship.

a. Fiduciary relationship

In order for the Murphys to prevail under the defalcation exception of section 523(a)(4), they "must initially prove that [the Snyders] owed a fiduciary duty to them." *In re Richey*, 103 B.R. 25, 31 (Bankr. D. Conn. 1989). Unfortunately, the concept of a fiduciary duty is "elastic" and "anything but clear," *United States v. Chestman*, 947 F.2d 551, 567, 570 (2d Cir. 1991), and the Bankruptcy Code "does not clarify the meaning of the term 'fiduciary capacity' as used in Section 523(a)(4)." *Hayes*, 183 F.3d at 167. Moreover, "[t]he federal law definition of fiduciary is different from"—and "more restrictive" than—"the traditional common law definition." *Richey*, 103 B.R. at 31. Still, general principles of fiduciary law are somewhat instructive.

The "paradigmatic" fiduciary relationship "involves discretionary authority and dependency: One person depends on another—the fiduciary—to serve his interests." *Chestman*, 947 F.2d at 569. Thus, a person "acts in a 'fiduciary capacity' when 'the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.'" *Id.* at 568–69 (quoting *Black's Law Dictionary* 564 (5th ed. 1979)). In the context of section 523(a)(4), the Second Circuit has indicated that two parties are in a fiduciary relationship when there is "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *Hayes*, 183 F.3d at 167.

The scope of section 523(a)(4)'s defalcation exception "is a question of federal law," but one that "frequently turns upon obligations attendant to relationships governed by state law." *Id.* at 166. Even though "not every state-law fiduciary is a Section 523(a)(4) 'fiduciary,'" *In re Hall*, 483 B.R. 281, 292 (Bankr. D. Conn. 2012), "state law can be an important factor in determining whether someone acted in a fiduciary capacity under Section 523(a)(4)." *Hayes*, 183 F.3d at 166.

Therefore, the initial question is whether the Snyders owed the Murphys fiduciary duties under state law—here, the law of New York.[7]

Four elements are "essential to the establishment of a fiduciary relationship" under New York law, *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 166 (E.D.N.Y. 2010):

>   (1) the vulnerability of one party to the other which

>   (2) results in the empowerment of the stronger party by the weaker[,] which

>   (3) empowerment has been solicited or accepted by the stronger party[,] and

>   (4) prevents the weaker party from effectively protecting itself.

*Id.* Fiduciary duties may arise both from "technical fiduciary relations" and from "those informal relations which exist whenever one [person] trusts in, and relies upon, another." *Allen v. WestPoint-Pepperell*, 945 F.2d 40, 45 (2d Cir. 1991) (quoting *Penato v. George*, 52 A.D.2d 939, 942 (2d Dep't 1976)). "Examples of such informal fiduciary relationships . . . include priest and parishioner, bank and depositor, majority and minority stockholder, and close friends or family members." *Brass v. Am. Film Techs.*, 987 F.2d 142, 151 (2d Cir. 1993) (citing Restatement

---

[7] The Snyders argue, as they did before the Bankruptcy Court, that "New Jersey provides the relevant state law as to whether Defendants owed Plaintiffs a fiduciary duty under §523(a)(4)." Appellants' Br., Doc. No. 16, at 27. But the District Court applied New York law in ruling on the Murphys' breach of contract claim. The Snyders not only failed to advance their argument in favor of New Jersey law before the District Court, but also they did not bother to appeal the District Court ruling. *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) ("[I]mplied consent is . . . sufficient to establish the applicable choice of law."); *Reed Constr. Data v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 423 (S.D.N.Y. 2014) ("A party can waive a choice-of-law argument."). Having waived their argument in favor of New Jersey law before the District Court, the Snyders are estopped from relitigating the choice-of-law issue here. *See Weston Funding Corp. v. Lafayette Towers*, 550 F.2d 710, 715 (2d Cir. 1977) ("The choice of . . . law issue is res judicata between the parties since it actually was litigated and decided."); *Nw. Airlines v. Astraea Aviation Servs.*, 930 F. Supp. 1317, 1328 n.11 (D. Minn. 1996) ("Th[e] Court's determination of the applicable law is part and parcel of its final resolution of the entire 'claim,' and thus, if collateral estoppel is applied, the choice-of-law determination cannot be relitigated."); *cf. In re Coudert Bros. LLP*, 673 F.3d 180, 190–91 (2d Cir. 2012) ("[I]t would be fundamentally unfair . . . to allow the defendant . . . to use a device of federal law (the bankruptcy code) to choose the forum and accompanying choice of law . . . .").

(Second) of Torts § 551 cmt. f). In addition, certain business relationships inherently entail fiduciary obligations, such as partnerships and joint ventures. *See N. Shipping Funds I v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 102 (S.D.N.Y. 2013). Whether a fiduciary relationship exists is "necessarily fact-specific." *EBC I v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19 (2005), and the court must consider "all the circumstances and conduct relevant to understanding the parties' relationship." *Bolton*, 757 F. Supp. 2d at 166.

Here, the undisputed facts show that the Snyders were in a fiduciary relationship with the Murphys under New York law. Although "mere kinship does not," of itself, "create a fiduciary relationship," *Chestman*, 947 F.2d at 568; *but see* Restatement (Second) of Torts § 551 cmt. f ("Members of the same family normally stand in a fiduciary relation to one another . . . ."), close friends and family members may reasonably be expected to "trust[] [one] another." *Marini v. Adamo*, 995 F. Supp. 2d 155, 199 (E.D.N.Y. 2014) (quoting *Brass*, 987 F.2d at 151), *aff'd*, 644 F. App'x 33 (2d Cir. 2016) (summary order). In *Marini v. Adamo*, for example, the plaintiff and the defendant "were close friends for ten years before they began conducting business." *See id.* Not only did the parties "spen[d] considerable time socializing with one another and traveling together," but also they became "godparents to each other's children." *Id.* at 165. The district court held—and the Second Circuit affirmed—that the parties' "close relationship" was "sufficient to create a fiduciary relationship," because the plaintiff's "complete 'confidence and reliance'" in the defendant "allowed [the defendant] to 'exercise [ ] control and dominance.'" *Marini*, 644 F. App'x at 35 (quoting *Marini*, 995 F. Supp. 2d at 202). In the present case, as in *Marini*, the Murphys and the Snyders "had a very close relationship, . . . celebrated holidays and vacationed together," and "enjoyed a relationship of personal trust." Bankr. Compl., App'x at 4; Bankr. Answer., App'x at 15–16. The parties' family relationship "far exceeded that of an arms-

length commercial relationship," *Marini*, 644 F. App'x at 35, and indicates that the Murphys "reasonably trusted" the Snyders to hold themselves to "something stricter than the morals of the market place." *See Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir. 1989) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928) (Cardozo, C.J.)).

Another indication that the parties were in a fiduciary relationship is that the Murphys "reasonably relied on [the Snyders'] superior expertise or knowledge." *Bolton*, 757 F. Supp. 2d at 167 (quoting *Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 122 (1st Dep't 1998)). In *Marini*, the defendant, a rare coin dealer, defrauded the plaintiff by selling him rare coins at "grossly inflated" values over several years. *Marini*, 995 F. Supp. 2d at 163. Although the plaintiff was a successful businessman who built and operated his own sweater manufacturing enterprise, he was "extremely unsophisticated regarding coins." *Id.* at 177. The plaintiff "never bought coins from anyone besides [the defendant], . . . never sold coins to anyone other than [the defendant]," and "never selected any coins; he solely relied on the advice and representations of [the defendant] regarding which coins to buy." *Id.* at 166. The court concluded that in light of the plaintiff's "lack of sophistication regarding coins" and the nature of the parties' relationship, it was "reasonable" for the plaintiff to rely on the defendant's "superior knowledge." *Id.* at 177, 202. Here, too, Stuart Snyder's decades of experience in custom home construction necessarily gave him and his wife far "superior . . . knowledge" of the market relative to the Murphys, who appear to have had no relevant experience. *See Bolton*, 757 F. Supp. 2d at 167 (quoting *Wiener*, 241 A.D.2d at 122). Furthermore, as in *Marini*, the Murphys only seem to have done business with the Snyders and "solely relied on the advice and representations" of the Snyders regarding where to invest. *Marini*, 995 F. Supp. 2d at 166. Because of the parties' "very close relationship" and "personal trust," Bankr. Compl., App'x at 4; Bankr. Answer, App'x at 15, as

well as the Snyders' "superior knowledge" of the market, *Marini*, 995 F. Supp. 2d at 202, the Murphys' reliance was reasonable. Therefore, "it is clear that [the Snyders] acted as [the Murphys'] fiduciar[ies]" under New York law. *See Marini*, 995 F. Supp. 2d at 202.

Even apart from the particular characteristics of the Snyders' and the Murphys' relationship, the parties were fiduciaries under New York law because they were engaged in a joint venture. "Under New York law, participants in a joint venture owe one another the same fiduciary duties that inhere between members of a partnership." *N. Shipping Funds I*, 921 F. Supp. 2d at 102 (quoting *Argilus, LLC v. PNC Fin. Servs. Grp.*, 419 F. App'x 115, 119 (2d Cir. 2011) (summary order)). Formation of a joint venture requires five elements:

> (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit;
>
> (2) their agreement must evidence their intent to be joint venturers;
>
> (3) each must make a contribution of property, financing, skill, knowledge, or effort;
>
> (4) each must have some degree of joint control over the venture; and
>
> (5) there must be a provision for the sharing of both profits and losses.

*Dinaco, Inc. v. Time Warner*, 346 F.3d 64, 67–68 (2d Cir. 2003). "[T]he absence of any one of these elements is fatal to the establishment of a joint venture." *N. Shipping Funds I*, 921 F. Supp. 2d at 102. I conclude that all five elements are met.

First, the Murphys and the Snyders entered into two "specific agreement[s]" to engage in real estate development "for profit." *Dinaco, Inc.*, 346 F.3d at 67–68. Second, the agreements "evidence[d] [the parties'] intent to be joint venturers," *id.* at 68, because both characterized the Murphys and the Snyders as "partners." *See Snyder*, 2017 WL 1839122, at *4. Third, "each [party] ma[de] a contribution" to the joint venture, the Murphys in the form of "financing," the Snyders in the form of "skill" and "knowledge." *Dinaco, Inc.*, 346 F.3d at 68; *see Cosy Goose*

*Hellas v. Cosy Goose USA*, 581 F. Supp. 2d 606, 620 (S.D.N.Y. 2008) ("[P]arties may evince their intent to be bound as joint venturers by commingling their property, skills, and efforts such that their individual contributions are subject to their co-venturers' actions, efforts, and failures."). Fourth, the Murphys and the Snyders both "ha[d] some degree of joint control over the venture," *Dinaco, Inc.*, 346 F.3d at 68, even though the parties did not "actually exercise the same degree of management control." *Richbell Info. Servs. v. Jupiter Partners*, 309 A.D.2d 288, 299 (1st Dep't 2003). "The inquiry as to the existence of this factor is limited to whether a member of the venture had *any* measure of control," *id.*, and a so-called "silent partner" may still participate in a joint venture.[8] *See Meinhard*, 29 N.Y. at 462 (parties entered into a "joint venture" to invest in real estate, and were "subject to fiduciary duties akin to those of partners," even though only one party "was to have sole power to 'manage, lease, underlet and operate' the building"). Finally, the parties' oral agreement contained "a provision for the sharing of both profits and losses." *Dinaco, Inc.*, 346 F.3d at 68. The Snyders were to keep profits after the Murphys received their twenty percent return, and—as the Snyders emphasize—both parties bore the "risk [of losses] inherent . . . [in] a real estate project in which there were no guarantees of any profit." *See* Appellants' Br., Doc. No. 16, at 35.

Hence, even if the Snyders did not owe the Murphys fiduciary duties by virtue of their superior knowledge and the parties' close relationship, the Snyders were "coadventure[r]s, subject to fiduciary duties akin to those of partners." *Meinhard*, 29 N.Y. at 462. Indeed, even under a joint venture theory, the Snyders still bore "[t]he heavier weight of duty," because they

---

[8] That Joseph Murphy allegedly "visit[ed] . . . job sites in Haworth to check up on his investment" suggests that the Murphys had some "measure of control" over the venture. *See* Appellants' Br., Doc. No. 16, at 13.

were not only "coadventurer[s] . . . , but . . . manager[s] as well." *See id.* Hence, I conclude that, under New York law, the Snyders bore fiduciary obligations to the Murphys.[9]

I also conclude that the Snyders owed fiduciary duties to the Murphys under federal law. "[T]here are federal limits on the ability of state law to expand the effects" of section 523(a)(4), lest states "deny a fresh start to their debtors by declaring all contractual relations fiduciary." *Hayes*, 183 F.3d at 166–67. Here, however, the Snyders' relationship with the Murphys falls comfortably within the federal definition of "fiduciary capacity." Under federal law, fiduciary relationships are "not limited to express trusts" or "technical trust[s]."[10] *Id.* at 167–68. Instead, fiduciary relationships are those that "involve a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *Id.* at 167. Here, the Snyders' decades of experience gave them "superior expertise" in and "superior

_____

[9] The Snyders argue that Doreen Snyder was not a fiduciary and cannot have committed defalcation because "there is no evidence she had any involvement whatsoever with Stuart's businesses at the time of [the Murphys'] investments, or with [the Murphys'] investments themselves." Appellants' Br., Doc. No. 16, at 24. Doreen still may be liable if Stuart acted as her agent, however. Although "the spousal relationship does not automatically impose vicarious liability on one spouse for the wrongful acts of the other," *In re Budnick*, 469 B.R. 158, 171 (Bankr. D. Conn. 2012), "much less evidence is required to establish a principal and agent relationship between husband and wife than between nonspouses." *In re Bear Stearns Cos. Secs., Derivative, and ERISA Litig.*, 308 F.R.D. 113, 121 (S.D.N.Y. 2015). "Under . . . New York law, a spouse's actions may bind the other spouse under an implied agency theory when the circumstances suggest that one either has the authority to bind the other or where one acquiesces to the other's actions." *Bear Stearns Cos.*, 308 F.R.D. at 121 (citing *Nalaskowski v. Golowicz*, 187 Misc. 725 (Sup. Ct. 1946)). Here, the District Court held that Doreen Snyder was liable to the Murphys for breach of contract, *see Snyder*, 2017 WL 1839122, at *4 n.4, a determination that the Snyders did not directly challenge or appeal. Assuming, *arguendo*, that Doreen was not involved in Stuart's businesses, in order to hold Doreen liable for breach of contract, the District Court must implicitly have concluded that the Snyders were each other's agents. That determination—"essential to the judgment" of Doreen Snyder's liability, *see Arizona v. California*, 530 U.S. 392, 414 (2000)—cannot be challenged collaterally here.

[10] For example, "the attorney-client relationship, although usually not involving a technical trustee or express trust, has long been understood to be a fiduciary relationship within the meaning of the defalcation exception." *In re Hayes*, 183 F.3d 162, 168 (2d Cir. 1999).

knowledge" of housing investments relative to the Murphys, *Marini*, 995 F. Supp. 2d at 202; *Bolton*, 757 F. Supp. 2d at 167, which enabled them to occupy "a position of ascendancy" in the parties' business interactions. *Hayes*, 183 F.3d at 167. Therefore, I hold that, as a matter of federal and New York law, the Snyders were in a fiduciary relationship with the Murphys.

      b.  Defalcation

Having concluded that the Snyders "act[ed] in a fiduciary capacity," I proceed to consider whether they committed a "defalcation." *See* 11 U.S.C. § 523(a)(4). "Defalcation" is an archaic term for a "breach of trust" or "a non-fraudulent debt." *Hyman*, 502 F.3d at 66 n.1 (quoting *Black's Law Dictionary* (8th ed. 2004); *Oxford English Dictionary* (2d ed. 1989)). In the bankruptcy context, defalcation requires "a culpable state of mind" in the form of intentional, knowing, or reckless conduct. *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269, 273–74 (2013). Where actual knowledge of wrongdoing is absent, the fiduciary must at least have "'consciously disregard[ed]' (or [been] willfully blind to) 'a substantial and unjustified risk' that his conduct w[ould] turn out to violate a fiduciary duty." *Id.* at 274 (quoting ALI, Model Penal Code § 2.02(2)(c) (1985)). "That risk 'must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.'" *Id.* (quoting Model Penal Code § 2.02(2)(c)) (emphasis in *Bullock*).

The Bankruptcy Court concluded that the Snyders committed defalcation because they engaged in at least "reckless behavior." *Snyder*, 2017 WL 1839122, at *9. I agree. The Snyders never returned the Murphys' investment or provided the promised twenty percent return on either project, and—in the case of the Bible Street Project—they never even bought the property that was supposed to be developed. Instead, the Snyders concede that they used the Murphys' investment in the Bible Street Project "for personal expenses . . . immediately after the

[Murphys] transferred the monies to them." *Id.* Bank records "confirm that substantially all of the $275,000[] transferred to the [Snyders]" was spent within two months. *Id.* Although the Snyders claim that the money "spen[t] . . . on personal expenses . . . totaled less than $20,000," Appellants' Br., Doc. No. 16, at 34, uncontested evidence in the record suggests that the total could be much more. For example, the Snyders acknowledge that, three days after the Murphys transferred the money to a virtually empty account, more than $30,000 was withdrawn from that account to pay credit card debt, and more than $18,000 more was withdrawn for the same purpose over the following two months. *See* Local Rule 56(a)2 Statement, App'x at 339. The Snyders also admit that they withdrew more than $10,000 in cash from the same account in September and October of 2016. *Id.* at 338. At any event, even accepting the Snyders' low estimate, misappropriating 10 percent of the Murphys' investment would still constitute a reckless breach of fiduciary duty.[11] *See Indep. Asset Mgmt. v. Zanger*, 538 F. Supp. 2d 704, 710 (S.D.N.Y. 2008) ("self-interested behavior . . . [is] a breach of . . . fiduciary duty"). The District Court Judgment is nondischargeable as a defalcation under section 523(a)(4).

---

[11] There is not the same evidence of deliberate malfeasance with respect to the Haworth Project, and the Snyders claim that the Murphys' investment in that project was only in the possession and control of another developer, Michael Maisel. *See* Appellants' Br., Doc. No. 16, at 11. But the District Court held that the Snyders—not Maisel—were liable for breaching the Haworth Project agreement. *Murphy*, 2014 U.S. Dist. LEXIS 134097, at *26. Even though the District Court held that the Murphys could not recover for that breach of contract as a breach of fiduciary duty because in New York, a plaintiff cannot recover on "[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim," *see William Kaufman Org. v. Graham & James LLP*, 269 A.D.2d 171, 173 (1st Dep't 2000), "conduct amounting to breach of a contractual obligation may also constitute the breach of a [fiduciary] duty . . . independent of such contract." *Bullmore v. Ernest & Young Cyman Islands*, 45 A.D.3d 461, 463 (1st Dep't 2007). Here, the "same conduct" that breached the Haworth Project agreement also violated the Snyders' fiduciary duties to the Murphys, *see Mandelblatt v. Devon Stores*, 132 A.D.2d 162, 167 (1st Dep't 1987), and so the breach of contract adjudicated by the Bankruptcy Court also constituted a nondischargeable defalcation under section 523(a)(4). *See In re Barksdale*, 438 B.R. 25, 32–33 (Bankr. N.D.N.Y. 2010).

2.  *Embezzlement*

The Bankruptcy Court also held that the District Court Judgment was nondischargeable because the debt was obtained through embezzlement. Here, the Snyders' arguments are somewhat stronger. "Section 523(a)(4) embezzlement is determined based on federal common law," and is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *In re Carrano*, 530 B.R. 540, 558 (Bankr. D. Conn. 2015). "In order '[t]o prove embezzlement, the creditor must show by a preponderance of the evidence (1) that the debtor appropriated the subject funds for his own benefit and (2) that he did so with fraudulent intent or deceit.'" *Id.* (quoting *Conn. Att'ys Title Ins. Co. v. Budnick (In re Budnick)*, 469 B.R. 158, 176 (Bankr. D. Conn. 2012)). Unlike defalcation, embezzlement requires a higher mental state of "bad faith or immorality." *see Bullock*, 569 U.S. at 273. Fraudulent intent "may be determined from the facts and circumstances surrounding the act," *Carrano*, 530 B.R. at 558, but the Second Circuit has reminded lower courts that "caution must be exercised in granting summary judgment when state of mind is in issue." *Res. Devs. v. Statue of Liberty–Ellis Island Found.*, 926 F.2d 134, 141 (2d Cir. 1991).

The Bankruptcy Court held that "the underlying debt was obtained by embezzlement" because the Snyders "rightfully possessed [the Murphys'] property" and "appropriated the property for use other than the use for which the property was entrusted," in circumstances that "imply a fraudulent intent." *Snyder*, 2017 WL 1839122, at *10. The first two conclusions are effectively uncontested: the record conclusively shows that that Snyders lawfully obtained the Murphys' money for the purpose of making investments, but then appropriated the money "for other projects and purposes"—including the Snyders' own personal expenses—"without notice to or authorization by the plaintiffs." *See id.*; *Murphy*, 2014 U.S. Dist. LEXIS 134097, at *27.

With respect to the Snyders' mental state, I agree with the Bankruptcy Court that a trier of fact appropriately could find that that the circumstances "imply a fraudulent intent" because the Snyders not only failed to make the promised investment, but also began to use the Murphys' money for personal expenses within days of receiving it. *Snyder*, 2017 WL 1839122, at *10; *cf. In re Nofer*, 514 B.R. 346, 356–57 (Bankr. E.D.N.Y. 2014) ("A partner or employee who diverts a corporation's funds for his or her own use commits embezzlement within the meaning of § 523(a)(4)."). I am less confident, though, that a jury would be *required* to find fraudulent intent, especially in light of the Second Circuit's repeated admonitions that "summary judgment is generally inappropriate where questions of intent and state of mind are implicated." *Gelb v. Bd. of Elections*, 224 F.3d 149, 157 (2d Cir. 2000); *see also Morgan v. Prudential Grp.*, 527 F. Supp. 257, 959 (S.D.N.Y. 1981) ("[A] particularly heavy burden [is] imposed on one who moves for summary judgment with respect to a state of mind."), *aff'd mem.* 729 F.2d 1443 (2d Cir. 1983). It is a close question whether the evidence in this case conclusively demonstrates that the Snyders acted in bad faith, such that "no reasonable [trier of fact] could find otherwise." *See Evans Med. v. Am. Cyanamid Co.*, 11 F. Supp. 2d 338, 360 (S.D.N.Y. 1998), *aff'd*, 215 F.3d 1347 (Fed. Cir. 1999). I need not decide the issue, however, because the nondischargeability of the District Court Judgment as a defalcation provides sufficient basis to affirm the Bankruptcy Court.

For the foregoing reasons, I affirm the Bankruptcy Court's award of summary judgment to the Murphys on Count Two of the Adversary Complaint.

C. Section 523(a)(6)

"Section 523(a)(6) of the Bankruptcy Code provides that a debt 'for willful and malicious injury by the debtor to another' is not dischargeable." *Kawaauhau v. Geiger*, 523 U.S. 57, 59 (1998). That exception requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Id.* at 61. "The injury caused by the debtor must also be

malicious, meaning 'wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will.'" *Ball*, 451 F.3d at 69 (quoting *In re Stelluti*, 94 F.3d 84, 87 (2d Cir. 1996)). "Malice may be implied by the acts and conduct of the debtor in the context of the surrounding circumstances," *id.* (internal quotation marks and brackets omitted), and "will be found where the debtor has breached a duty to the plaintiff founded in contract, statute or tort law, willfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff and under some aggravating circumstance." *In re Hambley*, 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005) (internal quotation marks omitted).

In the present case, the Bankruptcy Court held that the Snyders inflicted a "willful and malicious injury" upon the Murphys because they intentionally "breached the contract[s]" with the Murphys and "willfully used the Plaintiffs['] monies for personal expenses." *Snyder*, 2017 WL 1839122, at *11. Although the Snyders' "knowing breach of contract" does not satisfy the elements of section 523(a)(6), *see Kawaauhau*, 523 U.S. at 62, their use of the Murphys' money for personal expenses does. The Snyders' concededly "unauthorized use of [the Murphys'] money constitutes conversion because it was an unauthorized act which depriv[ed] the owner[s] of the use of the property." *In re Leigh*, 165 B.R. 203, 215 (Bankr. N.D. Ill. 1993). Furthermore, the tortious injury inflicted by the Snyders was intentional—in the sense of "substantially certain to cause injury," *see In re Kane*, 755 F.3d 1285, 1293 (11th Cir. 2014); *accord AUSA Life Ins. Co. v. Ernest & Young*, 206 F.3d 202, 221 (2d Cir. 2000) ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.") (quoting Restatement (Second) of Torts § 8A cmt. b)—because "[b]usiness persons are presumed to know that harm will result from conversion of a party's property." *Leigh*, 165 B.R. at 215.

In short, the Snyders' tortious misappropriation of the Murphys' money constituted "willful and malicious injury . . . to another" as a matter of law.[12] *See, e.g.*, *In re Horne*, 549 B.R. 241, 250 (Bankr. E.D. Cal. 2016) (debt was nondischargeable because debtor "unauthorized[ly] ret[ained] . . . [a] company] vehicle for personal use and without payment, . . . kn[owing] a financial loss to the corporation was substantially certain to occur"); *In re Chwat*, 203 B.R. 242, 249 (Bankr. E.D. Va. 1996) ("debtor acted with fraudulent intent or deceit when . . . he appropriated [ ] office equipment" because he "acted with intent to wrongfully deprive [creditor] of [ ] partnership property"); *In re Moore*, 136 B.R. 570, 573–74 (Bankr. S.D. Fla. 1991) (debtors' "conduct . . . [was] clearly proscribed under [section] 523(a)(6)" when they misused company "revenues . . . to pay certain of their personal living expenses"). As a result, the District Court Judgment is nondischargeable under section 523(a)(6). I affirm the Bankruptcy Court's award of summary judgment to the Murphys on Count Three of the Adversary Complaint.

D. <u>Amount of debt nondischargeable</u>

The Snyders appear to concede that a portion of the District Court Judgment is likely nondischargeable because they misappropriated the Murphys' money for personal expenses. The Snyders attempt to minimize their liability, however, by arguing that they should be allowed to discharge (a) all of the $100,000 in damages stemming from the Haworth Project, as well as (b) the "well over $200,000 of [the Murphys'] $275,000 investment" that "was, in fact" spent on the Bible Street Project. *See* Appellants' Br., Doc. No. 16, at 13. In other words, the Snyders assert that only the "less than $20,000" they admit was used for personal expenses should be

---

[12] To be sure, willfulness and maliciousness—like fraudulent intent— are states of mind. But with respect to the section 523(a)(6) claim, the Snyders' admitted actions establish "the requisite . . . intent, as a matter of law." *See Sporty's Farm v. Sportsman's Mkt.*, 202 F.3d 489, 499 (2d Cir. 2000); *see also id.* at 498 (holding that "there [was] more than enough evidence in the record below of 'bad faith intent' . . . , so that 'no reasonable factfinder could return a verdict against'" the plaintiff) (quoting *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999)).

nondischargeable, *see id.* at 14, because the remainder of the Murphys' damages stem solely from the breach of contract.

The Supreme Court has rejected in an analogous context the Snyders' suggested approach to parsing damages. In *Cohen v. de la Cruz*, 523 U.S. 213 (1998), the Court held that section 523(a)(2)(A) "prevents the discharge of *all* liability arising from fraud"—including "an award of treble damages"—and not merely "the value of the 'money, property, services, or . . . credit' the debtor obtains through fraud." *Id.* at 215 (emphasis added). The Court noted that section 523(a) consistently uses the word "debt" to "connot[e] broadly *any* liability arising from the specified object." *Id.* at 220 (emphasis added). Moreover, the Court reasoned, if the defendants were correct that "the fraud exception only barred discharge of the value of any money, property, etc., fraudulently obtained by the debtor," then "the objective of ensuring full recovery by the creditor would be ill served." *Id.* at 222. The Supreme Court doubted that Congress "would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud," and therefore held that the wrongdoer's "entire debt"—including "relief that may exceed the value obtained"—was "nondischargeable in bankruptcy." *Id.* at 223.

Here, notwithstanding that the Snyders committed defalcation, embezzlement, and conversion rather than fraud, the same principle applies. *See Hambley*, 329 B.R. at 403 ("Courts have interpreted [*Cohen*'s] holding to apply to nondischargeable claims under Sections 523(a)(4) and 523(a)(6) as well."). As the Supreme Court indicated, limiting section 523(a)'s exceptions to "the value of the money or property" obtained through defalcation, embezzlement, or tortious wrongdoing "could prevent even a compensatory recovery" for the Murphys. 523 U.S. at 222. The Snyders' approach also would require the Murphys to distinguish losses that solely arose

from the Snyders' breach of fiduciary duty from those that simultaneously arose from the Snyders' concomitant breach of contract. Such fine-toothed parsing would be unworkable.

Therefore, I conclude that the entire amount of the District Court Judgment is nondischargeable because the debt was obtained through defalcation under section 523(a)(4), and/or through a willful and malicious injury under section 523(a)(6). I affirm the Bankruptcy Court's ruling granting summary judgment to the Murphys on Counts Two and Three of the Complaint, and deeming nondischargeable the $450,000, plus interest and costs, awarded in the District Court Judgment.

## IV.    Conclusion

For the foregoing reasons, I affirm the Bankruptcy Court's ruling. The debt of $450,000, plus interest and costs, is nondischargeable under sections 523(a)(4) and 523(a)(6).

So ordered.

Dated at Bridgeport, Connecticut, this 23rd day of April 2018.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge